[No. A039437. First Dist., Div. Two. May 25, 1990.]

MARSHA R. REBNEY et al., Plaintiffs and Respondents, v. WELLS FARGO BANK, N.A., Defendant and Respondent; RALPH SANTIAGO ABASCAL et al., Objectors and Appellants.

[No. A043070. First Dist., Div. Two. May 25, 1990.]

PETER G. RUDOLFI et al., Plaintiffs and Respondents, v. BANK OF AMERICA et al., Defendants and Respondents; CALIFORNIA GROCERS ASSOCIATION, INC., et al., Objectors and Appellants.

1120

**COUNSEL**

Ralph Santiago Abascal, in pro. per., Saperstein & Seligman, Brad Seligman and Ernest M. Thayer for Objectors and Appellants in No. A039437.

Manuel Glenn Abascal and Kathy Shull Abascal for Objectors and Appellants in Nos. A039437 and A043070.

Gary J. Near, Kerr & Wagstaffe and Stephen Kaus for Objectors and Appellants in No. A043070.

Heller, Ehrman, White & McAuliffe, Weyman I. Lundquist, Richard L. Goff, Ida O. Abbott and Brian P. Brosnahan for Defendant and Respondent in No. A039437.

Morrison & Foerster, James J. Brosnahan, Kathleen V. Fisher, James F. McCabe, Carla B. Oakley, George W. Coombe, Jr., Winslow Christian and Arne D. Wagner for Defendants and Respondents in No. A043070.

David B. Baum, Sidney M. Wolinsky, Rosen & Phillips and Sanford Jay Rosen for Plaintiffs and Respondents in Nos. A039437 and A043070.

Venable, Baetjer & Howard, Benjamin R. Civiletti and Kathleen A. Calder as Amici Curiae on behalf of Plaintiffs and Respondents and Defendant and Respondent in No. A039437.

**OPINION**

**BENSON, Acting P. J.—**

## I. INTRODUCTION

These appeals challenge the settlement of class action litigation arising from the assessment of various bank checking account fees.

According to the parties, the appeals are about either collusion or fantasy. Appellants contend the settlements were the product of a collusive sellout between class counsel and the banks. Respondents claim the appeals are attributable to appellants' fantasy vision of wondrously large money judgments.

From our perspective, at least, the parties are each wrong. To us, these appeals are about appellate standing, the lack of which precludes nearly all the claims asserted by appellants.

## II. BACKGROUND

The litigation began in 1977 as three separate class actions against Wells Fargo Bank, N.A. Crocker National Bank and the Bank of America. The Wells Fargo and Crocker lawsuits were consolidated after Wells Fargo's 1986 acquisition of Crocker, and will be referred to collectively as the Wells Fargo action.

In each case the plaintiffs challenged the banks' assessment of fees against customers who wrote "NSF" checks, that is, checks for which there are not sufficient funds on deposit. Two types of NSF fees may be charged to a check writer: a returned item fee, which is charged if the bank dishonors (i.e., "bounces") a bad check, and an overdraft fee, which is charged if the bank honors the bad check.

The litigation consumed 10 years from commencement to pretrial settlement, and it occupied dozens of attorneys. The combined appellate records, which include nearly 20,000 pages of pleadings, memoranda and declarations, are incredibly lengthy, given the fact they are exclusively pretrial. Most of the procedural morass, however, need not be described here, as we are concerned only with what is essential to the resolution of the appeals.

### A. The Wells Fargo Action

In 1986, counsel for Wells Fargo and the class representatives moved for approval of a proposed settlement, which called for expansion of the existing class certification. The class had been certified in 1981 to include all present checking account holders who were subject to fees for writing NSF checks, and all present and former customers who had paid such fees. The proposed expansion implicated not only the two fees assessed against writers of NSF checks, but also nineteen other fees, generally referred to as "non-NSF" fees, charged to customers with various types of checking and savings accounts. After a hearing on the fairness of the proposed settlement, the judge refused to approve it, stating she was not convinced that all the

non-NSF fees had received adequate analysis by class counsel. Counsel then whittled down the expansion to include only the two NSF fees and six non-NSF fees. On June 2, 1987, the court concluded the six non-NSF fees had received adequate analysis and rendered judgment approving the settlement in that form.

The settlement applied not only to checking accounts but also to market rate accounts, on which interest is paid and only a limited number of checks may be written. The expanded class included all present or former account holders since March 17, 1973, and all customers who paid or were subject to any of the following fees since that date:

1. Returned item fees.

2. Overdraft fees.

3. Account maintenance fees, which are charged monthly but may be waived for certain accounts if the customer maintains a minimum balance.

4. Stop payment fees, which are charged when a customer orders the bank to stop payment on a check.

5. Deposited item returned (DIR) fees, which are charged to the depositor of someone else's bounced NSF check.

6. Savings account overdraft protection transfer fees, which are charged when funds are automatically transferred from a savings account by preexisting agreement to prevent an overdraft.

7. Credit card overdraft protection transfer fees, which are charged when funds are automatically transferred from a credit card account to prevent an overdraft.

8. Market rate account excess activity fees, which are charged when a customer exceeds the number of permissible transfers from a market rate account.[1]

The 45-page settlement agreement provided, in excruciating detail, for monetary relief to some customers and injunctive relief to the rest. Former customers, as well as present customers who already had overdraft

---

[1] These fees are a significant source of income to banks. "In 1986 service charges on deposits accounted for nearly 3 percent of total income compared to half that amount five years earlier." (Reed & Gill, Commercial Banking (4th ed. 1989) p. 195.) Plaintiffs' expert estimated that Wells Fargo and Crocker collected $452 million in NSF fees from 1973 to 1985.

protection, received 30 percent cash refunds of previously paid overdraft and returned item fees upon submission of valid claims. Former customers also received 30 percent cash refunds of stop payment fees upon submission of valid claims. There were no refunds of any other fees, and no other direct monetary recovery was made available to present customers. Instead, present customers benefitted from 17 categories of injunctive relief, consisting primarily of various check processing policies and procedures established by the settlement agreement.

These policies and procedures were intended to reduce the overall number of future NSF checks and related fees. They included, for example, nonassessment of NSF fees for overdrafts under $10; nonreturn of checks for overdrafts under $100; no holds on deposited checks of less than $500 (on the theory that holds may cause NSF activity); provision of incentives (through fee credits and waivers) to obtain overdraft protection; payment of smaller checks first when multiple checks cause an overdraft (in order to minimize the number of returned items); and prompt notice whenever an NSF fee is imposed. A $1 million consumer education fund was created. No fees were eliminated, but some of their amounts were restricted. Also, the agreement eliminated the provision of automatic NSF fee waivers to customers who had accounts with high average balances.

The settlement agreement was effective for two years and was not stayed during appeal. It expired on October 1, 1989, evidently fully performed, and thus its injunctive provisions are no longer binding.

The appellants are Ralph Santiago Abascal (who is the named class representative in the Crocker action), Dorothy de Oliveira, Dee Filichia, David Bobiak and Carolyn Wood. Each objected to the court's approval of the settlement, appeared at the fairness hearing, and is appealing as an objector. Wood's appeal is independent of the other appellants, who are proceeding as a group and will be referred to collectively as the Abascal appellants.

### B. The Bank of America Action

The Bank of America settlement was similar but not identical to the Wells Fargo settlement. Counsel for the class and the bank moved for settlement approval in 1987. As in the Wells Fargo case, the settlement agreement called for expansion of the existing class certification, which had been limited to the two NSF fees. The expanded certification included only five of the eight fees involved in the Wells Fargo settlement: returned item, overdraft, account maintenance, DIR, and savings account overdraft protection transfer fees. Also included within the scope of the settlement were customers who had high-volume business accounts for which account

maintenance charges are assessed "on analysis," based on the total number of transactions of all types and the average balance in the account, rather than on a flat fee basis. (On-analysis accounts were excluded from the Wells Fargo settlement.)

The settlement did not provide for any cash refunds. Former customers were entitled to receive a coupon for credit of up to $25 for use in purchasing various services from the bank. Present customers were entitled to receive monetary credits upon obtaining overdraft protection, and also received essentially the same injunctive benefits as those provided in the Wells Fargo settlement. A $2.5 million consumer education fund was created, and the bank also established a $10 million zero-interest loan fund for construction or rehabilitation of low income housing.

On May 26, 1988, after a fairness hearing, the court rendered judgment approving the settlement. The settlement was made effective for two years and was not stayed on appeal. It is scheduled to expire on July 1, 1990.

The appellants are the California Grocers Association, Inc., Jeanne Louise Shull and Nicole Lastreto. Each objected to the court's approval of the settlement, appeared at the fairness hearing, and is appealing as an objector. They are proceeding as a group and will be referred to collectively as the CGA appellants.

*C. The Related Appeals and Writ Petitions*

Nine other related appeals and two related writ petitions pending in this court have been stayed until disposition of the present appeals.

Four of the stayed appeals are from orders dismissing other actions against Wells Fargo and Bank of America based on the settlement of the present cases. (*Filichia* v. *Wells Fargo Bank* (A040510); *Bobiak* v. *Crocker National Bank* (A040511); *Roxas* v. *Bank of America* (A044874); *Checchi* v. *Bank of America* (A044955).) Three of the appeals are from orders denying preliminary injunctions in the dismissed actions. (*Filichia* v. *Wells Fargo Bank* (A035167); *Bobiak* v. *Crocker National Bank* (A035168); *Roxas* v. *Bank of America* (A035643).) The other two appeals are from the attorney fees award in the present Wells Fargo case (*Rebney* v. *Wells Fargo Bank* (A041869)) and a postjudgment order in the present Bank of America case enforcing a protective order pertaining to discovery (*Rudolfi* v. *Bank of America* (A045586)).

The writ petitions challenge two prejudgment orders in the present Bank of America case, denying a motion for decertification and portions of a

motion for summary adjudication. (*Bank of America* v. *Superior Court* (A039204); *Bank of America* v. *Superior Court* (A039407).)

In May 1989, Justice William R. Channell of Division Four of this court held a prehearing conference for the purpose of coordinating the disposition of the various appeals and writs. (Cal. Rules of Court, rule 19.5.) The conference yielded an order establishing a briefing schedule for the present two appeals and staying any further briefing in the remaining appeals and writ petitions. The present appeals were not formally consolidated, given the differences between them; instead, we ordered that they would be considered together.

### D. The New Action Against Bank of America

Shortly after the judgment approving the Bank of America settlement, the California Grocers Association and a coplaintiff commenced a new class action against Bank of America in another county (Alameda), challenging the bank's assessment of DIR fees. The superior court certified the class on July 5, 1989. The bank filed a petition for an extraordinary writ requiring the superior court to vacate its certification. (*Bank of America* v. *Superior Court* (A046822).) The merits of the petition are addressed in an unpublished companion opinion.

## III. DISCUSSION

### A. Appellate Standing

The Abascal and CGA appellants raise multiple issues concerning the propriety of the class expansions and the fairness of the settlements. These parties, however, utterly lack standing to raise those issues on appeal. This is because they either did not suffer any of the purported harm of which they complain and thus were not aggrieved, or in the case of the California Grocers Association because of a conflict with its members and its unusual partial nonparty status due to a partial opt out from the settlement.

We start with the rule that appeals may be taken only by *aggrieved parties.* (Code Civ. Proc., § 902.) ██ Appellants must be parties of record, and their rights or interests must be injuriously affected by the judgment. (*County of Alameda* v. *Carleson* (1971) 5 Cal.3d 730, 736-737 [97 Cal.Rptr. 385, 488 P.2d 953].) They may not assert error that injuriously affected only nonappealing coparties. (*Nichols* v. *Nichols* (1933) 135 Cal.App. 488, 491 [27 P.2d 414]; accord *In re Marriage of McLucas* (1989) 210 Cal.App.3d 83, 90 [258 Cal.App. 133].)

As will be demonstrated, these standing requirements are fatal to the assertion of the expansion and fairness issues in both these appeals. Because the standing deficiencies were virtually ignored by the banks and class counsel in their briefs, we gave the affected parties the opportunity to submit supplemental letter briefs on appellate standing (Gov. Code, § 68081), and each has done so.

### 1. The Wells Fargo expansion and fairness issues

The Abascal appellants' expansion and fairness arguments in the Wells Fargo action are as follows:

1. It was error to include DIR fees, overdraft protection transfer fees, excess activity fees and market rate accounts in the expanded class certification because the named class representatives—Marsha R. Rebney and Ralph Abascal—did not pay those fees or have market rate accounts, so that their claims were not typical of class members who did and therefore they were not adequate class representatives as to those members. (See *Blum* v. *Yaretsky* (1982) 457 U.S. 991 [73 L.Ed.2d 534, 102 S.Ct. 2777]; *General Telephone Co. of Southwest* v. *Falcon* (1982) 457 U.S. 147 [72 L.Ed.2d 740, 102 S.Ct. 2364]; *Trotsky* v. *Los Angeles Fed. Sav. & Loan Assn.* (1975) 48 Cal.App.3d 134 [121 Cal.Rptr. 637].)

2. Rebney was not an adequate representative of customers with high average balances who had qualified for the automatic NSF fee waivers eliminated by the settlement.

3. No substantial evidence supported the court's finding that class counsel had adequately analyzed the six non-NSF fees.

4. The settlement was unfair to class members who paid non-NSF fees because they received no cash refunds.

5. The settlement was unfair to class members with high average balances because it eliminated the automatic NSF fee waivers for which they might have qualified.

█ Each and every one of these purported errors would have injuriously affected only those class members who had paid non-NSF fees, qualified for automatic NSF fee waivers, or had market rate accounts, and thus would have been harmed by the claimed inadequate representation and unfairness. None of the Abascal appellants is so situated (except perhaps in one inconsequential respect; see *post*, fn. 2). The only fees demonstrated with

certainty to have been paid by them are NSF fees. They did not qualify for automatic NSF fee waivers or have market rate accounts.

Appellants claim in their supplemental letter brief that they all paid account maintenance fees and that Filichia and Bobiak paid DIR fees. But the record is murky on even these limited claims. In the portion of the reporter's transcript cited by appellants for the proposition that Ralph Abascal paid account maintenance fees, he actually said only that "I am a depositor with just some of the most ordinary demand deposit accounts, straight checking account." He did not say he paid any maintenance fees, much less describe the nature and extent of any such payments. His opening brief concedes that the record does not show what type of accounts he held. Conceivably, he might have maintained minimum balances resulting in maintenance fee waivers. The same may be said for De Oliveira, Filichia and Bobiak, as to whom the record is completely silent regarding maintenance fees.[2]

For the proposition that Filichia and Bobiak paid DIR fees, appellants cite complaints filed in two of the stayed related cases. (*Filichia* v. *Wells Fargo Bank* (A040510 & A035167); *Bobiak* v. *Crocker National Bank* (A040511 & A035168); see *ante*, at p. 1127.) The complaints, however, merely stated nonspecifically that these individuals had paid "NSF check charges," and identified three categories of such charges generally assessed by the banks, including returned item, overdraft and DIR fees. There were no allegations as to which of the three fees Filichia and Bobiak actually paid or that they paid all three; thus there is no real claim that they paid DIR fees.

Indeed, nobody seems to have given much thought at all, either below or on appeal, to precisely which fees were paid by appellants. The idea that the role of appellants' counsel is to seek the redress of injuries suffered by their

---

[2]Appellants must have paid *some* account maintenance fees, if for no other reason than their payment of NSF fees indicates a failure to maintain a minimum balance. But even so, account maintenance fees are encompassed in only two of appellants' fairness arguments: that no substantial evidence supported the finding of adequate analysis of the non-NSF fees, and that there were no refunds for class members who paid non-NSF fees. While appellants claim account maintenance fees are "exceedingly profitable," they have not provided supporting argument by comparing any single account maintenance fee with evidence of the bank's underlying cost (in sharp contrast to their challenges to the other fees). They merely cite a 1984 study indicating that the bank's *cumulative* revenues from "fee income plus spread income" for 12 types of accounts exceeded costs by between 16 percent and 66 percent (for an average of 33 percent), hardly the stuff of obscene profits. Account maintenance fees are little more than an afterthought in appellants' briefs. Absent more specific and compelling evidence and argument, we cannot conclude the settlement was unfair with regard to those fees.

clients seems to have been forgotten among the 640 pages of briefing for these 2 appeals.

The problem with the Abascal appellants' position is exemplified by what they seem to consider one of their more compelling arguments, that because the named plaintiffs paid no DIR fees they were not adequate representatives of "megalithic commercial enterprises such as Safeway or Luckys, Macy's or PG&E" who pay huge amounts in DIR fees. This argument may make sense from the perspective of those "megalithic commercial enterprises," but we have heard no complaints from them, and surely not because they lack the resources to litigate. Any such wrong done to Safeway did not harm the Abascal appellants in the slightest, and might even have benefitted them. If, as they claim, skewed representation caused the settlement to have an "overwhelming NSF 'subclass' tilt," to the detriment of those who paid non-NSF fees and whose rights "were simply thrown into the hopper," then the Abascal appellants, as members of the NSF subclass, were the beneficiaries of that unfairness.

Ralph Abascal's dual role as named plaintiff and objector makes for a particularly strange paradox: he contends he was not an appropriate advocate at the trial level for class members who paid DIR, overdraft protection transfer and excess activity fees or had market rate accounts, yet he argues in their behalf on appeal. How can he have it both ways?

In their supplemental letter brief on appellate standing, appellants argue they should not be bound by the requirement of being aggrieved. First, they contend this requirement does not and should not apply to appeals from judgments approving class action settlements because "otherwise there will be no review at all" of the effect of settlements on the parties who were aggrieved. The correct response is obvious: there will be review if any aggrieved parties desire it; all they have to do is appear as objectors at the fairness hearing and then take an appeal. Even the leading authority on class actions sets forth the aggrieved party requirement within the context of appeals from judgments approving class action settlements. (2 Newberg on Class Actions (2d ed. 1985) § 11.59, p. 484 ["any aggrieved party to the settlement proceedings may appeal the entry of a final judgment after settlement approval"]; see also *Research Corporation* v. *Asgrow Seed Company* (7th Cir. 1970) 425 F.2d 1059, 1060 [objector to class action settlement "has a right to appeal from an adverse final judgment"]; cf. *Pettway* v. *American Cast Iron Pipe Co.* (5th Cir. 1978) 576 F.2d 1157, 1181 [appellants challenging contested judgment and settlement could not challenge adequacy of contested judgment award to members of subclass of which they were not members].)

Second, appellants invoke the "guardian" role of the courts to protect the rights of absentees in class action litigation (*Greenfield* v. *Villager Industries, Inc.* (3d Cir. 1973) 483 F.2d 824, 832), and contend it would be a "fundamental contradiction" if the trial court's guardian role is unrestricted but the appellate court's role is narrowed by appellate standing principles. The scope of appellate review, however, is never defined by the parameters of trial court jurisdiction, but is instead limited by specialized jurisdictional principles that are unique to appellate litigation. The requirement of standing to appeal is one of those principles, and because it is jurisdictional (*Life* v. *County of Los Angeles* (1990) 218 Cal.App.3d 1287, 1292, fn. 3 [267 Cal.Rptr. 557]; *In re Marriage of Tushinsky* (1988) 203 Cal.App.3d 136, 143 [249 Cal.Rptr. 611]) it imposes absolute limitations on the appellate court's guardian role.

Third, appellants cite *In re General Motors Corp. Engine Interchange Lit.* (7th Cir. 1979) 594 F.2d 1106 for the proposition that class members with any measure of appellate standing are entitled to assert errors that aggrieved a nonappealing class member, regardless of whether they were themselves aggrieved by such errors. But *General Motors* did not so hold; rather, the court simply permitted class members to assert errors by which they were *themselves* aggrieved on behalf of the entire class, without regard to whether the nonappealing parties were members of a different subclass. (*Id.* at pp. 1121-1123.) The appellants had been harmed by each of the substantive errors asserted (involving the conduct of settlement negotiations and the form of the settlement); thus it was appropriate to extend review to nonappealing parties who had sustained the same injury. (Cf. *Estate of McDill* (1975) 14 Cal.3d 831, 840-841 [122 Cal.Rptr. 754, 537 P.2d 874] [reversal of order distributing estate was extended to nonappealing sister of appellant because they were both identically aggrieved by the order].) *General Motors* was not a case in which the appellants asserted error by which they were not themselves aggrieved.

In summary, the Abascal appellants were not aggrieved by the errors they assert with regard to the expansion of class certification and the fairness of the settlement, and thus they lack standing to assert those errors as a basis for reversal. This is no mere technicality, but is grounded in the most basic notion of why courts entertain civil appeals. We are here to provide relief for appellants who have been wronged by trial court error. Our resources are limited and thus are not brought to bear when appellants have suffered no wrong but instead seek to advance the interests of others who have not themselves complained. The guiding principle is one often encountered in daily life: no harm, no foul.

## 2. The Bank of America expansion and fairness issues

The CGA appellants' expansion and fairness arguments in the Bank of America action are as follows:

1. It was error for the expanded class certification to include high volume business accounts for which maintenance fees are assessed on analysis because the evidence did not show what type of business account was held by the named class representative—Peter G. Rudolfi—and thus there was no showing that his claims were typical of class members with on-analysis accounts.

2. It was error to include DIR fees in the expanded class certification because there was no showing that Rudolfi had a high volume of DIRs and thus was an adequate representative of "megalithic commercial enterprises" that did.

3. It was error to include DIR fees in the expanded class certification because Rudolfi could not adequately represent high-volume depositors of "on-us" NSF checks—that is, checks both written and deposited by Bank of America customers—while simultaneously representing the check writers, since the two groups have "diametrically opposed" interests regarding who should bear the full cost of the bank's "one time processing of the same NSF check."

4. It was error to include savings account overdraft protection transfer fees in the expanded class certification because there was no evidence as to the bank's costs for such transfers.

5. The settlement was unfair to persons with a high volume of DIRs because, even if it reduced the overall number of future NSF checks and hence DIR fees, it did not eliminate DIR fees entirely.

■ The same appellate standing deficiency as in the Wells Fargo case afflicts Jeanne Louise Shull and Nicole Lastreto, as well as the California Grocers Association to the extent it is appealing in its own capacity. Each and every one of these purported errors would have injuriously affected only those class members who had on-analysis accounts, had a high volume of DIRs, or paid savings account overdraft protection transfer fees, and thus would have been harmed by the claimed inadequate representation and unfairness. Appellants' supplemental letter brief on appellate standing concedes that none of the CGA appellants had on-analysis accounts or had a high volume of DIRs. They have never claimed they paid savings account

overdraft protection transfer fees. Consequently they were not aggrieved by the purported expansion and fairness errors of which they complain.

■ The organizational appellate standing of the California Grocers Association is another question entirely. Appellants contend CGA has organizational standing to proceed on behalf of its members (see generally *United Steelworkers, etc.* v. *University of Ala.* (5th Cir. 1979) 599 F.2d 56, 58-59), some of whom apparently did have on-analysis accounts and had a high volume of DIRs and thus were aggrieved.

One problem with this position is that CGA occasionally pays DIR fees for NSF checks received from its own members in payment of membership dues. Thus, CGA is a depositor of NSF checks written by the class members on whose behalf it seeks to proceed. The applicable rule is that organizational standing will be withheld if the organization lacks a community of interest with its members and thus cannot faithfully represent their interests. (*Salton City etc. Owners Assn.* v. *M. Penn Phillips Co.* (1977) 75 Cal.App.3d 184, 190 [141 Cal.Rptr. 895]; see *County of San Luis Obispo* v. *Abalone Alliance* (1986) 178 Cal.App.3d 848, 864 [223 Cal.Rptr. 846].) If, as the CGA appellants claim, the interests of writers and depositors of on-us NSF checks are "diametrically opposed" with regard to who should bear the full cost of NSF check processing, it is difficult to see how CGA as a depositor can faithfully represent the interests of its checkwriting members while arguing, as it does, that the writer should bear the full cost.

Even if we were to overlook this conflict of interest on the assumption it is largely theoretical, there is another fatal flaw in CGA's organizational appellate standing. The settlement agreement permitted class members to opt out of the settlement as to claims for monetary relief. CGA did so and is suing Bank of America separately in Alameda County. (*Ante*, at p. 1128.) CGA is therefore not even a party, much less aggrieved, with regard to the monetary relief aspects of the settlement. (*In re Corrugated Container Antitrust Litigation* (5th Cir. 1985) 756 F.2d 411, 418-419 [opt-out plaintiff is not a party to class action and not bound by judgment]; see *County of Alameda* v. *Carleson, supra*, 5 Cal.3d at p. 736 [only a party of record may appeal].)

A partial opt out from the monetary but not injunctive aspects of a class action settlement is unusual but not unprecedented. It is contemplated in the context of "hybrid" employment discrimination class actions in which members seek both classwide injunctive relief and individual monetary relief consisting of backpay. In these circumstances the action is bifurcated: liability and the right to injunctive relief are tried in the first stage, and monetary claims are tried in the second stage. Two subclasses are created: a

class for injunctive relief and a class for monetary relief. No opt out is permitted at the injunctive stage, but the trial court has discretion to permit opting out at the monetary stage. (*Holmes* v. *Continental Can Co.* (11th Cir. 1983) 706 F.2d 1144, 1154-1160; accord *Cox* v. *American Cast Iron Pipe Co.* (11th Cir. 1986) 784 F.2d 1546, 1554; see generally *Cotton* v. *Hinton* (5th Cir. 1977) 559 F.2d 1326, 1333-1334, 1338 [settlement providing for injunctive and monetary relief permitted class members to opt out of monetary settlement and litigate their monetary claims separately in the same action]; 3 Newberg on Class Actions (2d ed. 1985), 1990 supp., § 16.16, p. 64 [where subclasses are certified and class members have claims in more than one subclass, court has discretion to permit opting out of part of the action].)

The decisions discussing this procedure are silent as to the appropriate course of action for class members who are dissatisfied with the injunctive as well as monetary portions of the settlement. (See, e.g., *Holmes* v. *Continental Can Co., supra,* 706 F.2d at p. 1146, fn. 1 [appellants challenged only division of monetary fund and not the nonmonetary portions of the settlement].) If class members wish to challenge both aspects of the settlement, clearly they may forego the opt out and appeal as to both. (*Trotsky* v. *Los Angeles Fed. Sav. & Loan Assn., supra*, 48 Cal.App.3d at p. 139; *Ace Heating & Plumbing Company* v. *Crane Company* (3d Cir. 1971) 453 F.2d 30, 32-33.) Should they also be permitted the alternative of opting out, bringing a separate action for damages, and simultaneously taking a partial appeal as to the injunctive portions of the settlement?

Within the present context, at least, the answer is no. The problem here is that the settlement is nonseverable, and thus a successful challenge by CGA to the injunctive portions would undermine the entire settlement and judgment, including the monetary portions. (*Cotton* v. *Hinton, supra,* 559 F.2d 1326, 1331-1332 [class action settlement must stand or fall as a whole, and appellate court may not delete only portions of it]; see also *State of California* v. *Levi Strauss & Co.* (1986) 41 Cal.3d 460, 471 [224 Cal.Rptr. 605, 715 P.2d 564]; *Trotsky* v. *Los Angeles Fed. Sav. & Loan Assn., supra*, 48 Cal.App.3d at p. 153.) ■ The applicable rule is that, upon an attempted partial appeal from a nonseverable judgment, the appellate court may not engage in partial review, although it may "consider and act upon the entire judgment when necessary to accomplish justice." (*Everly Enterprises, Inc.* v. *Altman* (1960) 54 Cal.2d 761, 765 [8 Cal.Rptr. 455, 356 P.2d 199]; see also *Blache* v. *Blache* (1951) 37 Cal.2d 531, 538 [233 P.2d 547] ["the appellate court can reverse the entire judgment if it is necessary to do justice"]; *Estate of Murphey* (1936) 7 Cal.2d 712, 717 [62 P.2d 374] ["the appellate court should do that which justice requires"].) ■ Here, to review the entire judgment inclusive of the monetary portions at CGA's behest, while at the

same time CGA pursues the recovery of damages separately in its new action against Bank of America in Alameda County, would be *unjust* for several reasons.

First, such an approach would permit CGA to simultaneously litigate the same damage claims in two separate lawsuits—the present appeal and the Alameda County action.[3] Second, it would permit CGA to litigate indirectly, in this appeal, that which, as a nonaggrieved stranger to the monetary portions of the settlement, it may not litigate directly. Third, it would permit CGA, as a nonaggrieved stranger, to challenge the monetary portions of the settlement when the only parties with appellate standing to do so on the grounds asserted here have uniformly chosen not to, but have elected instead to accept the monetary benefits of the settlement. And finally, it would permit all of this in spite of the fact that there was an alternative procedure available to CGA for directly litigating both the monetary and injunctive elements—appeal without opting out.[4]

There is something fundamentally wrong about this, both substantively and procedurally. It would be unfair to the parties who have standing to assert the CGA appellants' challenges to the monetary relief aspects of the settlement, all of whom chose not to do so, and would permit unentitled review and double litigation of monetary issues despite the availability of an avenue for obtaining full consideration of all issues in a single proceeding. Under these peculiar circumstances, justice does not require, but is indeed offended by, review of the entire judgment at CGA's organizational behest. And as partial review is impossible, we cannot afford CGA any review at all of the expansion and fairness issues based on organizational appellate standing.[5]

---

[3] CGA could continue litigating the monetary issues in this action after reversal, on the theory that reversal would extinguish the opt out since it was based on the settlement.

[4] These factors set this case far apart from the normal case in which a partial appeal from a nonseverable judgment would put the entire judgment before the appellate court. (See, e.g., *Trotsky* v. *Los Angeles Fed. Sav. & Loan Assn., supra*, 48 Cal.App.3d at p. 153.)

[5] In *Pettway* v. *American Cast Iron Pipe Co., supra*, 576 F.2d 1157, 1181-1182, the court held that opt outs from a backpay award portion of a settlement had standing to appeal the settlement approval. But the court focused on the question of *finality* of the backpay distribution order for purposes of appeal: respondent had argued the order was not final as to the opt outs because it permitted them to pursue individual damage claims in the same lawsuit, but the court concluded the order did not so permit, but required separate, independent lawsuits by the opt outs, and thus was final in that it was "intended to end the litigation." (*Id.* at p. 1181.) The court did not consider the lack of party status regarding backpay as a result of opting out on such terms. But the court went on to hold that the requirement of separate lawsuits was error and the opt outs should have been permitted to litigate in the same action—i.e., they should have remained parties after all. (*Id.* at p. 1220.) Because, in contrast to the present case, the denial of party status was attributable to trial court error, it would have been fundamentally unfair to preclude appeal on that basis. Thus this aspect of *Pettway* is inapposite here. Also, there was no severability problem in *Pettway* because the injunctive ele-

One final point: appellants contend CGA opted out only in its "individual capacity" and remained in the action on behalf of its members. The record does not bear this out; if anything, it suggests the contrary. The opt-out notice said simply that CGA elected "to opt-out" and to be excluded "for all purposes provided by law." Nothing limited the opt out to CGA's individual capacity, and the opt out "for all purposes provided by law" would seem to indicate otherwise. And even if the opt out had only been individual, it would still have extinguished CGA's organizational standing to assert its members' monetary claims in this proceeding, due to the resulting absence of injury to CGA itself from the monetary aspects of the settlement. (See *United Steelworkers, etc.* v. *University of Ala., supra*, 599 F.2d at p. 59 [union could seek declaratory and injunctive relief on behalf of members, but lack of allegation of monetary injury to union precluded standing on appeal to claim damages on behalf of members]; see also *County of San Luis Obispo* v. *Abalone Alliance, supra*, 178 Cal.App.3d at p. 864.) Thus, while CGA claims it merely "split its representative capacity qua trade association from its individual capacity to sue," as to monetary relief this could not have been done. An individual opt out would still have deprived CGA of organizational appellate standing as to monetary issues, since the opt out eliminated the prerequisite monetary injury to CGA from the settlement.

In summary, the CGA appellants, like the Abascal appellants, lack standing to assert their claims of error regarding the expansion of class certification and the fairness of the settlement. Jeanne Louise Shull, Nicole Lastreto and CGA in its individual capacity were not aggrieved by the errors they assert. CGA's conflict with the interests of its members and its unusual partial nonparty status deprive it of any organizational appellate standing.

3. *Other issues*

The CGA appellants assert two other arguments, unrelated to class expansion and fairness, for which appellate standing is similarly lacking.

■ First, they contend the manner of proposed settlement notice to class members with high-volume business accounts (newspaper publication for former customers and individual notice accompanying periodic statements mailed to current customers) was insufficient to satisfy due process requirements. Because Shull, Lastreto and CGA in its individual capacity did not have such accounts and thus were not aggrieved, and because of the

---

ment was the result of a contested judgment while the backpay award was attributable to settlement, so that there could have been reversal as to the backpay award without affecting the injunctive element (although in fact there was reversal as to both). (*Id.* at pp. 1171-1175.)

problems with CGA's organizational standing, this claim of error is not cognizable. Standing principles have not been vitiated by assertions of constitutional error. (See *Whitmore* v. *Arkansas* (1990) 495 U.S. __, __ [109 L.Ed.2d 135, 149, 110 S.Ct. 1717].)[6]

■ Second, they contend the court abused its discretion in denying a motion for leave to take the depositions of class counsel. But Shull and Lastreto had not joined in this motion and thus were not aggrieved. And, once again, appellate standing should not be extended to CGA because reversal on this basis would have to be total and would therefore be unjust in light of CGA's partial opt out and pursuit of relief in Alameda County.

### 4. The merits of the fairness issues

■ Although we need not decide the merits of the fairness issues in either of these cases, even if we did we would not reverse. It is impossible to conclude that the trial courts abused their discretion in determining the settlements were fair. (See *Mallick* v. *Superior Court* (1979) 89 Cal.App.3d 434, 438 [152 Cal.Rptr. 503] ["the trial court has broad powers to determine whether a proposed settlement in a class action is fair"].)

The sheer volume of the joint appendices and reporter's transcripts for these cases belies appellants' claims of an "extraordinary rush to judgment." In each case the settlement approval process spanned a period of more than half a year. The objectors were afforded ample opportunities to

---

[6]This argument is also substantively meritless. The CGA appellants claimed at oral argument that there should have been individual notice by registered mail or similar method to all former customers, who had "substantial" claims, relying on *Chance* v. *Superior Court* (1962) 58 Cal.2d 275, 290 [23 Cal.Rptr. 761, 373 P.2d 849], which "assumed" that the class members in that case would be given notice by "registered mail or other like reliable method." But there were only a few thousand class members in *Chance,* and all of them were ascertainable. (*Ibid.*) Here, in contrast, there were seven million former customers, and there is no showing that it was reasonably ascertainable how many held high-volume business accounts; thus appellants have been reduced to claiming there should have been a survey of all seven million for "substantial" claims and then notice by an untold number of registered letters. Such a burdensome undertaking would have been "entirely out of proportion to its beneficial results when these are compared to the purely theoretical risks of a less expensive method of notifying the class." (*Cartt* v. *Superior Court* (1975) 50 Cal.App.3d 960, 973 [124 Cal.Rptr. 376].)

Appellants also claimed at oral argument, for the first time on appeal, that former consumer customers should have received four-time published notice pursuant to the Consumer Legal Remedies Act (Civ. Code, § 1750 et seq.). But appellants have not only waived this argument by failing to raise it in their briefs (e.g., *Lotts* v. *Board of Park Commrs.* (1936) 13 Cal.App.2d 625, 636 [57 P.2d 215]), they also lack standing to raise it, since they are not *former* customers. The argument is also substantively meritless. The Act requires four-time publication only for notice that a class action has been permitted. (Civ. Code, § 1781, subd. (d).) Notice of a *proposed settlement,* in contrast, "shall be given in such manner as the court directs . . . ." (Civ. Code, § 1781, subd. (f).)

conduct discovery of internal bank documents and state their objections orally and in writing. Many eventually withdrew their objections (including the Consumers Union and Public Advocates, Inc.). The fairness hearings were lengthy and probative. The judges did not rubber stamp the settlements but instead gave them careful consideration, as reflected in lengthy statements of decision. Indeed, the Wells Fargo judge rejected the initial settlement entirely.

In both cases the settlement negotiations between the parties were overseen by respected neutral facilitators (former United States Attorney General Benjamin R. Civiletti for the Wells Fargo case and attorney Michael D. Shane for the Bank of America case). Appellants' claims of collusion were contradicted by the facilitators' assurances to the trial judges that the Wells Fargo negotiations were "difficult, heated, and complex" and "at all times conducted in an adversarial fashion" and that the Bank of America negotiations "were at all times at arm's length" and "in the initial stages quite contentious."

Admittedly, the monetary relief provided by the settlements was relatively paltry. But the primary focus was on prospective relief, and the terms of the settlements appear to have the salutary effect of reducing the overall number of future NSF checks and related fees.

Appellants claim some of the check processing policies established by the settlements were preexisting. In fact, the only policies demonstrated with any certainty in the appellate records to have preexisted were Wells Fargo's policy of paying overdrafts under $100, which a bank vice-chairman admitted had predated the settlement by a "[y]ear or two," and Bank of America's policy of paying smaller checks first, which the trial court noted had existed since the "early 1970's."[7] But even if there were more preexisting policies than just these two, we could not say they were unattributable to the pendency of the litigation and would not have been abandoned absent the settlements. For example, the Wells Fargo settlement facilitator testified at the fairness hearing that, with regard to continuation of the policy of paying overdrafts under $100, absent the settlement the bank "might well

---

[7] The Abascal appellants contend Wells Fargo's policies of not holding deposited checks, paying smaller checks first, and giving prompt notice of NSF fees were also preexisting. But the portions of the appellate record cited in support of these claims are inconclusive. The CGA appellants have moved to augment the record with nine pages of deposition testimony showing the preexistence of other Bank of America policies. Such augmentation is impossible, however, because this evidence was never filed or lodged in the superior court. (Cal. Rules of Court, rule 12(a); *DeYoung* v. *Del Mar Thoroughbred Club* (1984) 159 Cal.App.3d 858, 862-863 [206 Cal.Rptr. 28].) We cannot say the trial judge erroneously ignored the preexistence of such policies when the pertinent evidence was never presented to him.

have gone in the direction of a very hard line" and "I'm sure that their attitude . . . would have been very different."

Appellants' counsel seem to think that megamillion-dollar victories would have been in the bag if only *they* had been permitted to try these cases. But surely they appreciate that nothing is assured when litigating against commercial giants with vast litigative resources, particular in such complex litigation as this, which would strain the cognitive capacities of any jury. Defense judgments were hardly beyond the realm of possibility.

Even the fact that the settlements were of limited duration, so that their injunctive provisions were not binding after the expiration dates, did not compel a finding of unfairness. As the Wells Fargo settlement facilitator testified, the threat of renewed litigation if the banks revert to their old ways provides a substantial motivation for them to continue the policies and procedures established in the settlements beyond the expiration dates.

The remainder of this opinion addresses the few issues that appellants have standing to raise.

*B. The Denial of a Continuance*

██ Ralph Abascal contends the Wells Fargo court committed reversible error by denying a continuance of the hearing on preliminary settlement approval to allow him time to procure and present expert witness evidence on the comprehensibility of the notice of proposed settlement to be provided to the class. Obviously Abascal has appellate standing to assert this point, since he requested the continuance.

Abascal first sought the continuance in a memorandum and supporting declaration on October 24, 1986. He stated he had sought to secure expert analysis of the settlement notice but was unable to "complete that task," and "the court ought to allow a sufficient period of time for this to be accomplished . . . ." The supporting declaration mentioned a similar analysis by linguist Veda R. Charrow in an unrelated case, and said such an analysis "would not be a lengthy undertaking" but Abascal had encountered scheduling problems with three linguists he had contacted.

The hearing was scheduled to begin on October 30, 1986, but it did not actually begin until November 4. On the latter date Abascal said he had spoken to Charrow "this morning . . . and she told me she could prepare an analysis in three weeks." He argued that the analysis should occur before the court certified the expanded class. The court proceeded with the hearing, however, without expressly ruling on the continuance request. The

hearing spanned several dates through November 17. On November 19, the court tentatively approved the class expansion and settlement agreement and ordered notice of the proposed settlement to be provided to the class.

This chronology demonstrates that even though the court in effect denied the request for a continuance by proceeding with the hearing, the hearing was not concluded until 24 days after the written request. Abascal had all that time to secure the expert analysis. (Indeed, he had even more time than that, having articulated his comprehensibility argument as early as October 10.) Thus he was not prejudiced by the failure to grant a continuance. Twenty-four days from the date of the written request to the conclusion of the hearing was ample time to do that which he himself had said "would not be a lengthy undertaking." Even if, as appellants claim, nobody knew when the hearing would end, the possibility of significant delay was very real, given the nature and history of the litigation, and provided a reason to continue the pursuit of the expert evidence in anticipation of enough delay to permit its presentation.

The published decisions have differed theoretically when concluding that a ruling on a continuance request was not prejudicial. Some have indicated that the ruling was *not an abuse of discretion*—i.e., there was no error at all—if it did not prejudice the appellant. (E.g., *Larson* v. *Solbakken* (1963) 221 Cal.App.2d 410, 429 [34 Cal.Rptr. 450]; see also *Rankin* v. *Curtis* (1986) 183 Cal.App.3d 939, 947 [228 Cal.Rptr. 753] [discretion is abused if lack of continuance results in denial of fair hearing].) Others have said that there is no miscarriage of justice and thus *no reversible error*—i.e., assuming there was error, it was harmless—if there was no prejudice to the appellant. (E.g., *In re Marriage of Johnson* (1982) 134 Cal.App.3d 148, 155 [184 Cal.Rptr. 444]; see *Cohen* v. *Herbert* (1960) 186 Cal.App.2d 488, 494 [denial of continuance is reversible error if it results in denial of a fair hearing].)

The former approach is appropriate when prejudice is viewed as of the time of the court's ruling: if no prejudice was evident at the time of the ruling, then there was no abuse of discretion. The latter approach is appropriate when prejudice is viewed in hindsight: if, after the hearing, we can conclude that even assuming the court erred in denying a continuance the appellant was ultimately not prejudiced by the error, then any error was harmless.

Here, we view prejudice in hindsight—not from the perspective of the court when it in effect denied the continuance and proceeded with the hearing, but from the perspective of whether, as of the conclusion of the hearing, Abascal was ultimately prejudiced. From this perspective, even assuming the court erred in failing to grant a continuance, the error was

harmless, since Abascal ultimately had ample time before the conclusion of the hearing to procure and present the expert analysis.

### C. Approval of Class Counsel's Attorney Fees Agreement

■ The Abascal appellants challenge the propriety of a written agreement between class counsel by which they arranged to share, on a percentage basis, in the lump sum attorney fees awarded to them as a group under the terms of the Wells Fargo settlement.

The appellants sought disclosure of the agreement prior to approval of the settlement. Before the fairness hearing, in open court, they argued for disclosure because they believed the agreement "required a split of fees without regard to the actual number of hours individual attorneys worked" and thereby could create a "tremendous incentive" for some of the class attorneys to settle; for example, an attorney with few hours in the case would have an incentive to settle rather than going through a long trial and appeal. They offered to agree to a protective order against disclosure of the agreement to third parties.

The court did not order disclosure but instead reviewed the agreement in camera. The judge concluded in her statement of decision that "[t]he private fee arrangements among counsel for plaintiffs, which the Court has examined in camera, and which provide in part for percentage arrangements, would not interfere with class counsel's ability to litigate the case."

The Abascal appellants claim the percentage agreement was unlawful because it allocated fees without regard to work performed and thus gave individual attorneys an incentive not to litigate. They have standing to assert this point because, if the agreement provided an incentive for one or more of the class attorneys not to litigate and thereby put his own interests ahead of the clients, then all class members were harmed.

The applicable substantive law is that an award of attorney fees in class action litigation must be tied to counsel's actual efforts to benefit the class. (*In re Agent Orange Product Liability Litigation* (2d Cir. 1987) 818 F.2d 216, 223.) This does not "mean that class counsel need follow, line by line, the lodestar formula in arriving at an agreement as to fee distribution. Obviously, the needs of large class litigation may at times require class counsel, in assessing the relative value of an individual attorney's contribution, to turn to factors more subjective than a mere hourly fee analysis. It

does mean that the distribution of fees must bear *some relationship to the services rendered.*" (*Ibid.*, italics added.)[8]

But the problem with appellants' claim that the agreement provided for fee recoveries without regard to work performed is that the appellate record does not substantiate this, because it does not include the agreement at all. According to appellants, the agreement is "not available to be made a part of this record" and was examined only by the superior court in camera.

The court's ruling upholding the validity of the agreement is presumed correct on appeal, and appellants have the burden of overcoming this presumption by affirmatively showing error on an adequate record. (E.g., *Maria P.* v. *Riles* (1987) 43 Cal.3d 1281, 1295 [240 Cal.Rptr. 872, 743 P.2d 932]; *Kearl* v. *Board of Medical Quality Assurance* (1986) 189 Cal.App.3d 1040, 1051 [236 Cal.Rptr. 526].) They have failed to sustain this burden. If the agreement is not available to be made a part of the record, then appellants have no one to blame but themselves. The nondisclosure of the agreement did not prevent them from taking steps in the trial court to ensure that it was included in the record, even if unavailable for their inspection, through a request that the trial court retain the agreement as a lodged, sealed exhibit for transmission under seal to the Court of Appeal. Having failed to do so, they cannot now complain of the agreement's unavailability for appellate review.

A declaration by one of the class attorneys stated that the agreement reflected both "the varying contributions of attorneys to the case" and "matters not directly relevant to work effort on the bank cases, such as the termination of a partnership between [two of the class attorneys] and a reallocation of cases and responsibilities unrelated to these bank cases." If the "varying contributions" factor was predominant, the agreement might very well have been valid on the ground the distribution of fees bore "some relationship to the services rendered." (*In re Agent Orange Product Liability Litigation, supra,* 818 F.2d at p. 223.) The lack of a record precludes us from concluding otherwise.

The Abascal appellants also claim the court erred in denying disclosure of the agreements. This claim has merit. "[C]ounsel must inform the court

---

[8] A finding that the settlement was fair is not dispositive of the attorney fees issue. "The test to be applied is whether, at the time a fee sharing agreement is reached, class counsel are placed in a position that might endanger the fair representation of their clients and whether they will be compensated on some basis other than for legal services performed." (*In re Agent Orange Product Liability Litigation, supra,* 818 F.2d at p. 224.) To make the fairness of the settlement the test would encourage concealment of the agreement until after the settlement. (*Ibid.*)

of the existence of a fee sharing agreement at the time it is formulated." (818 F.2d at p. 226.) While apparently not done here at the earliest possible time, the court was apprised of the agreement well in advance of settlement approval. But the class must be able to share in that disclosure "so that an opportunity is afforded for comment and objection." (*In re Agent Orange Product Liability Litigation* (E.D.N.Y. 1985) 611 F.Supp. 1452, 1463, rev'd on other grounds and approved on this point in *In re Agent Orange Product Liability Litigation, supra*, 818 F.2d at p. 226.) If, as here, counsel claim the need to protect their privacy, the court can do so by issuing a protective order that precludes disclosure to third parties—which appellants expressly proposed here. The in camera review procedure deprived appellants of an adequate opportunity to argue the substantive issue.

Again, however, the lack of a meaningful record is fatal to the claim of error, for the record does not show the error was prejudicial. Because the agreement is not in the record, appellants have failed to show that, had there been adequate disclosure, they could have shown any impropriety in the agreement.[9]

 The CGA appellants incorporate the same two claims in the Bank of America case. But there, in addition to the problems discussed above, any error has been waived. The appellate record does not demonstrate that either of these points was asserted below. The judge's statement of decision included no findings as to the propriety of class counsel's agreement; the only related statement was a notation that class counsel had agreed there would be no minimum attorney fees and the fees would be subject to later arbitration. Thus any error was waived by failure to assert it at the trial level. (See 9 Witkin, Cal. Procedure (3d ed. 1985) Appeal, § 311, p. 321.)[10]

---

[9] And even if there were reversible error on either of these points, it is doubtful the judiciary would be able to provide a meaningful remedy for these appellants. Unlike the *Agent Orange* litigation, where the appellant was one of the parties to the attorney fees agreement, none of the parties to this agreement have challenged it; instead, they all argue in support of it. Even if we were to reverse on this point and the trial court were to apportion the lump sum award differently among class counsel, if they ignored the apportionment and privately split the fees in a contrary fashion there does not seem to be anything the Abascal appellants would be able to do about it.

[10] The CGA appellants also contend the Bank of America court erred when it ordered the entire superior court file to be sealed. However, we have now ordered the entire *appellate* record unsealed, except for very limited portions that Bank of America has shown are protected by a confidentiality order which the trial court properly imposed as a condition of its exercise of discretion to restrict discovery by objectors. (See 2 Newberg on Class Actions (2d ed. 1985) § 11.56, p. 476.) Appellants have not identified any other document they want unsealed that was included in the superior court file but not in the appellate record. Consequently, the propriety of the superior court seal is now a moot question.

## D. The Carolyn Wood Appeal

Carolyn Wood's appeal in the Wells Fargo case is entirely independent of the Abascal appellants. She made a separate appearance at the fairness hearing and has filed her own appellate briefs.

The Wood appeal arises from a provision in the settlement notice stating that the settlement agreement and pleadings could be inspected during regular business hours at the office of one of the class attorneys—David B. Baum—or at the office of the clerk of the court. Wood objected to the proposed settlement and moved to intervene. In a supporting declaration her counsel, Ernest M. Thayer, claimed he had been denied access to the documents referred to in the notice. The declaration asserted the following efforts to review the documents:

On December 18, 1986, during the lunch hour, Thayer attempted to review the court's files, which were in the trial judge's department, but was told by the department clerk that the judge had them and the clerk could not obtain them. He then telephoned the number listed for class counsel, but the person who answered said she was only an answering service employee and could give him no information. Finally, he went to the address listed for class counsel, but a woman said counsel had made no provision for inspection of the documents there and he would have to go to the court clerk's office. On December 31, at 3:45 p.m., he again attempted to review the court's files, but the doors to the trial judge's department were locked; a commissioner admitted him to the courtroom but was unable to find the files.

Wood asserts two grounds for reversal: she was denied due process because the court and class counsel deprived her of an opportunity to inspect the documents, and she should have been permitted to intervene in the action.

On the first point, it is not clear Thayer was denied access by the court clerk or by Baum. His declaration demonstrates only a feeble effort to review the files through those means. He visited the clerk's office at the noon hour on December 18 and the end of the day on New Year's Eve, times when the trial judge was least likely to be available to provide the documents, and his declaration does not indicate that he left a message with the telephone answering service for Baum to call him back. Further effort to review the court's files at a propitious hour after January 1 might well have been successful, as indicated by the court's comment to Thayer on January 20 that the record, while previously not fully available, was currently "in the stage that you can examine better at this point."

But even assuming Thayer was improperly denied access by the court clerk and by Baum, he was able to review the documents anyway, through other means. At the fairness hearing, when Thayer argued his client's objections, he conceded that as an attorney who had previously been retained by one of the class attorneys he "obviously had access through other means, and had knowledge of how to obtain these matters in other ways than did the normal person who received this notice . . . ." On appeal he does not deny that he somehow had access to the files before the fairness hearing, but merely claims *the court clerk and Baum* did not provide access. His own admission below constitutes evidence of access through some means *other* than the court clerk or Baum. Since Thayer was able to gain access to the documents through those other means (regardless of whether he availed himself of the opportunity), he was not prejudiced by any denial of access through the court clerk or Baum. Hence the judgment may not be reversed on this basis. (Cal. Const., art. VI, § 13; *People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].)

■ On the second point, the dispositive rule is that the omission to permit intervention was not an abuse of discretion if Wood's interests were adequately represented by the class representative. (See Code Civ. Proc., § 387, subd. (b); 7B Wright et al., Federal Practice and Procedure (Civ. 2d ed. 1986) § 1799, at p. 443.) On appeal, Wood's sole claim of inadequate representation is that class counsel denied her access to the files. Again, even assuming Baum denied access to Thayer (which is not at all clear given the absence of evidence that Thayer left a telephone message for Baum), Wood was not prejudiced, since she had access through other means. Because of the absence of prejudice, the challenged conduct by Baum did not result in inadequate representation and was thus not a basis for intervention.[11]

## IV. CONCLUSION

Appellants have referred to this litigation as a "Frankenstein." The allusion is curious indeed. In the 1818 novel, the death of the monster was not expressly portrayed; rather, at the close of the story he jumped from a ship onto an ice raft and "was soon borne away by the waves and lost in

[11] All the parties have moved for judicial notice or to augment the record. The motions primarily call our attention to documents in related proceedings. The only documents with which we need be concerned, however, are the Filicia and Bobiak complaints (see *ante,* p. 1130) and the writ petition arising from CGA's new class action in Alameda County (see *ante,* p. 1128), of which we take judicial notice. Disposition of the appeals does not require any other judicial notice or augmentation. (Additionally, one motion is patently meritless; see *ante,* fn. 7, p. 1139.) Thus in all other respects the motions are denied.

darkness and distance." (Shelley, Frankenstein (Bantam 1981) p. 206.) The present ending to this litigation is about as ambiguous as the death of the Frankenstein monster. Given the limited duration of the settlements and the demonstrated tenacity of appellants' counsel, the threat of a sequel looms as large as the monster itself. In this regard the following comment on the literary monster would seem to apply equally to the litigation: "The possibility of [its] survival, perhaps indestructability, suggests that emotions endure where reason dies." (*Id.*, intro. by Diane Johnson, at p. xix.)

## V. DISPOSITION

The judgments are affirmed. The parties shall bear their own costs on appeal.

Peterson, J., and Anderson, J., concurred.

A petition for a rehearing was denied June 18, 1990, and the petition of all appellants for review by the Supreme Court was denied September 13, 1990. Lucas, C. J., and Panelli, J., did not participate therein.